ADWAR IVKO LLC
Stephanie Furgang Adwar
Armando Llorens
Megan Abner
225 West 34th Street Fl 9
New York NY 10122
212-725-1818

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ARIEL NACHMAN (p/k/a ARIEL PEARL) and
MICHAEL NACHMAN,

                              Plaintiffs,                 Civil Action No: 1:24 cv 3371

           -against                             **JURY DEMANDED**

JOSH STONE and REAL VIBEZ ONLY, LLC,

                            Defendants.
-------------------------------------------------------------X

## VERFIED COMPLAINT

COME NOW the Plaintiffs Ariel Nachman (p/k/a ARIEL PEARL)("ARIEL") and Michael

Nachman ("NACHMAN") (jointly "Plaintiffs"), through the undersigned attorneys, and by way of

Complaint allege the following:

### NATURE OF ACTION

This is a Civil Action brought by ARIEL and NACHMAN.  As hereinafter more fully

described, this is a civil action for (a) copyright infringement arising under the Copyright Laws of

the United States, the Act of October 19, 1976, 17 U.S.C. §§ 101, et seq.; (b) false endorsement

arising under the Lanham Act, 17 U.S.C. § 1125(a)(1)(A); (c) breach of contract; (d) defamation

under New York State Law; (e) unjust enrichment;  (f) fraud; (g) fraud in the inducement;  (h)

intentional infliction of emotional distress; (i) negligent infliction of emotional distress; (j) violation

-1-

of New York general business laws; (k) a declaration that the Exclusive Arist Agreement between ARIEL and Defendants is extinguished; and (l) right of privacy violations under New York State Law.

## JURISDICTION & PARTIES

1.     Plaintiff ARIEL NACHMAN ("ARIEL") is a natural person who resides at 25 Vinton Street, Long Beach, New York, in the County of Nassau and State of New York.

2.     Plaintiff MICHAEL NACHMAN ("NACHMAN") is a natural person who resides at 25 Vinton Street, Long Beach, New York, in the County of Nassau and State of New York.

3.     Defendant JOSH STONE ("STONE") is a natural person who resides at 3178 Clubhouse Road, in Merrick, New York, in the County of Nassau and State of New York.  STONE is also the sole corporate officer and owner of Defendant REAL VIBEZ ONLY, INC.

4.     Defendant REAL VIBEZ ONLY, INC. ("RVO") is a for-profit corporation created for the purpose of operating as a music and record company, and is organized and existing pursuant to the laws of the State of New York, with its principal place of business located at 100 Crossways Park Drive West, Suite 402, Woodbury, New York 11797, in the County of Nassau, State of New York.

5.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (Federal Question) and 28 U.S.C. § 1367 (Supplemental Jurisdiction.)

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as defendant reside in the district.

## STATEMENT OF FACTS

7.     ARIEL is a singer.  By age 10, ARIEL's beautiful singing voice was well-known to family and friends, and she was always cast in the starring roles of her middle school, high school and community musicals.

8.     During the years 2014 through 2018, NACHMAN, his wife Lorraine ("Lori") Nachman and ARIEL were repeatedly informed by STONE's parents, Jill and Marc Stone, that STONE was a "rising star" in the record business and was signed to a major record label as a rap recording artist.  Jill and Marc Stone also repeatedly informed the Nachman family during that time that STONE was very well-connected in the music business.

9.      NACHMAN and ARIEL reasonably relied upon, and believed to be true aforesaid representations and assurances that STONE was, in fact, a successful recording artist signed to a major record label, and was very well-connected in the music business.

**A.   STONE/RVO'S Interest in Signing ARIEL as a Recording Artist**

10.     On or about March 30, 2018, when ARIEL was sixteen (16) years old, STONE attended his parents annual Passover seder and heard ARIEL sing and perform Broadway show tunes for his parents' guests.  When she finished singing STONE approached ARIEL and her parents and asked them if ARIEL would be interested in "coming into the studio" to record three (3) songs.

11.     STONE repeated the claims his parents had been communicating to the Nachman family: that he was very successful in the music business and had contacts in all the major record companies.  STONE further claimed that he was "the A&R rep" working directly with Nicki Minaj, and that he also worked for Maverick Music Management where he participated in managing the careers of such famous recording artists as Lil Wayne and Drake.  STONE assured the Nachman

family that ARIEL was very talented, and he would be able to simply "walk ARIEL in" to any of the major record labels and "make her a star."

**B.**   **STONE's Material Statements Were False and Reasonably Relied Upon by Plaintiffs**

12.   At the time STONE informed and assured Plaintiffs that he had the capacity and intent to "make ARIEL a star", and further informed and assured Plaintiffs that he worked directly with Nicki Minaj, Lil Wayne, Drake and others, and that he had the connections, influence and ability to walk ARIEL into any of the major record labels and get her signed to a record deal. When STONE made these representations to the Plaintiffs, he knew that the statements were false.

13.   As a result of STONE's false material representations which were reasonably relied upon by the Plaintiffs, Plaintiffs believed that STONE was, in fact, a successful recording artist signed to a major record label who was working directly with the likes of Nicki Minaj, Lil Wayne, Drake and others, and that he was so well-connected in the music business that he actually did possess the connections, influence and capacity to walk ARIEL into any of the major record labels and get her signed to a record deal there.

14.   After STONE's false representations to Plaintiffs on or about March 30, 2018, STONE sent NACHMAN the lyrics and audio recordings of STONE's ex-girlfriend, Avian Haviv's voice singing the three (3) songs he wanted ARIEL to record.  STONE explained to NACHMAN that wanted to replace the track containing Haviv's voice with a track of ARIEL's voice singing the three (3) songs.

15.   At the time STONE sent the aforesaid lyrics and recordings to NACHMAN, STONE explained that he wanted ARIEL to re-record the songs Haviv previously recorded, because he had gotten Haviv a deal with a major record label but she refused to sign the deal when STONE informed her that he would not accompany her on the national and international concert

-4-

tours the record company had purportedly arranged for Haviv, causing him to end the business and personal relationship.

16.     STONE's claim that he had recently obtained a major record deal for Haviv was false and material, and intended to induce the Plaintiffs into signing agreements with STONE.

17.     STONE's representations to Plaintiffs were false.  In fact it was Haviv who ended her relationships with STONE when she discovered, *inter alia*, that STONE had defrauded her into believing many of the same promises STONE had begun making to the Plaintiffs: that he could and would make her a "rich and famous" recording artist within a few months, if she obeyed his orders and  followed his instructions to, *inter alia*: work hard at whatever tasks STONE gave her, including appearing for overnight recording sessions, giving STONE her social media account passwords, enabling him to assert total dominion and control over such accounts while locking Haviv out of her own social media accounts.

18.     In fact, after some four (4) years of STONE's promises to Haviv that he would obtain a major record label agreement, Haviv realized that STONE never had the capacity or the intent to obtain a major record deal for Haviv, and that STONE had fraudulently induced Haviv to enter into a contractual agreement with his corporate entities, and to participate in a romantic relationship with STONE.

19.     STONE never disclosed his dispute with Haviv, which led to protracted litigation, to the Plaintiffs.  The lawsuit was entitled *Money by Any Means Necessary, Inc. v. Avian Haviv*, New York County Supreme Court Index No. 156526/2014.

20.      Plaintiffs reasonably relied upon the false material representations made by Defendants. As a result, ARIEL was excited at the prospect of recording for Defendants STONE and RVO.

**C.      STONE Makes False Material Representations to NACHMAN To Induce Him to Sign Producers Agreement That Would Obligate NACHMAN To Pay $250,000**

21.      On or about November 29-30, 2018, STONE represented to NACHMAN that NACHMAN needed to sign a "producer agreement" for purchase of the master recordings of the songs ARIEL was recording for him and RVO.  As part of that agreement NACHMAN would be obligated to invest **$250,000.00** into the purchase of such master recordings, and for other goods and services purportedly required to launch ARIEL's career as a recording artist.

22.      STONE represented to NACHMAN that the initial investment of **$250,000** would cover such expenses as the recording of Ariel's first three (3) songs and ownership of said master recordings, the hiring of choreographers, videographers, dancers and actors to appear in music videos of the songs ARIEL was recording for Defendants.  STONE assured them that their initial **$250,000** investment would be sufficient to "package" ARIEL to impress music companies, so he could "walk her into" any major music label and sign her to a record deal.  STONE further assured NACHMAN that once ARIEL was signed to a major record deal the record company would take over all recording and promotional expenses incurred after ARIEL signed a contract.

**D.      ARIEL Records Songs With STONE**

23.      On or about the evening of November 29, 2018, and continuing into the early morning hours of November 30, 2018, Plaintiff ARIEL recorded her first two songs for Defendants STONE and RVO, at Quad Studios, in Manhattan: *"Pyramid"* and *"Lied Because You Left"*.

24.      On or about the night of December 22, 2018, and continuing into the early morning hours of December 23, 2018, ARIEL recorded another song for Defendants STONE and RVO, entitled: *"Get 2 You"*.

-6-

E.    **STONE Continues His Fraudulent Scheme to Defraud NACHMAN**

25.    On Monday, January 14, 2019, STONE sent an e-mail to NACHMAN, memorializing their recent discussions about STONE advising NACHMAN to invest **$250,000.00** into various goods and services STONE assured NACHMAN would be necessary for him to get ARIEL signed to a major record deal.

26.    On or about Wednesday, January 16, 2019, STONE had a telephonic meeting with NACHMAN and his wife, Lorraine Nachman, regarding STONE's plan to develop ARIEL into a successful recording artist.  During this meeting STONE instructed NACHMAN to take certain actions before he would begin comprehensive efforts to secure ARIEL a major recording deal. Specifically, STONE demanded the following actions:

   a)    Set up a "production company" LLC to enter into a Producer Agreement with Defendants STONE and RVO on ARIEL's behalf;

   b)    Set up a corporate bank account for such production company, and deposit **$250,000** into such account to pay for all the services STONE assured them were required in order to "package" ARIEL to attract the interest of major record label executives;

   c)    Pay Defendants STONE and RVO the sum of **$120,000** to purchase the "master" recordings of **three (3) songs Ariel had *already* recorded for them**: *"Pyramid"*, *"Lied Because You Left"* and *"Get to You"*;

   d)    Plaintiffs would be required to spend another **$81,500** within the next six (6) months for the following expenses:

      i.    $30,000    (3-month Social Media campaign commitment)

      ii.   $10,500    (Electronic Press Kit - "EPK")

      iii.  $ 5,000    (Music video editing)

-7-

|      |           |                |
|------|-----------|----------------|
| iv.  | $12,000   | (Photographer) |
| v.   | $10,000   | (Stylist)      |
| vi.  | $ 8,000   | ("Glam")       |
| vii. | $ 6,000   | (Makeup)       |

27.     STONE made the following, specific promises to Plaintiffs during their aforesaid January 16, 2019, telephone conference:

a)      "Ariel will be doing shows within 10 months";

b)      "Ariel will be booked to do the Dominican Republic Parade;

c)      If they agreed to pay $30,000 for a 3-month Social Media Commitment that would result in "400,000 to 600,000 views";

d)      Ariel's recording of the song *"Pyramid"* will be released on the radio;

e)      "Record companies will want to see a full package before Investing in Ariel";

f)      Defendant STONE played ARIEL's songs and showed her pictures to his mother's friend who was an entertainment business executive, "and she said, "Disney!"

g)      Finally, STONE gave NACHMAN a short deadline to accept his terms demanding: You have to "give me an answer by <u>Monday</u>!!"

28.     STONE knew that his above-stated representations were false.  STONE also knew that: i) he lacked the capacity to deliver on any of his promises; ii) he would never cause any of the songs ARIEL had already recorded for Defendants, nor any of the songs ARIEL would record for

Defendants in the future, to be released and promoted in such a way that they would make any royalties for Plaintiffs.

29.     In fact, in the five years that STONE has been working with ARIEL, STONE has caused only four (4) of the twenty-one songs ARIEL recorded for STONE and RVO, to be released.

30.     When STONE convinced NACHMAN to pay **$250,000.00**, STONE knew that he was fraudulently inducing NACHMAN to pay such monies to Defendants for goods and services that were not worth the amount of money STONE was charging NACHMAN.  STONE knew that he could not get ARIEL a record deal, and that Defendants' intentions were to:  i) Take large sums of money from NACHMAN to finance his own lavish lifestyle and that the only money STONE was making in the music business was the money he was taking from NACHMAN;  ii) Take large sums of money from NACHMAN to pay STONE's costs to record his own rap songs and produce his own music videos, such that NACHMAN was unwittingly financing STONE's attempts to get himself signed to a record deal; and   iii) Exercise total dominion and control over the personal life of the then-16-year-old ARIEL, to boost his ego and support his fantastical self-image as being a "big-time" record company executive who could command ARIEL to appear for photographic shoots, recording sessions for his own rap songs and make any other personal appearances STONE ordered her to make on a few hours' notice – for no compensation.

**F.     STONE Exploits ARIEL**

31.     In fact, not only was ARIEL required to pay her own expenses for hair stylists and ground travel, ARIEL *never* received *any* compensation for *any* of the services she performed at STONE'S direction during the five (5) years of Defendants' involvement in the purported "development" of ARIEL into a successful recording artist.

**G.    STONE Overcharges NACHMAN For Master Recordings**

32.    When STONE instructed NACHMAN to pay him **$145,000.00** to own the master recordings of ARIEL's voice singing four (4) songs, STONE *knew* that:  i) he was over-charging NACHMAN; and ii) that the 5% ownership shares in the publishing rights provided in the Producers Agreement in the four (4) songs ARIEL recorded were worthless when purchased by NACHMAN because the songs were never going to be released.

**H.    In Reliance on STONE's False Material Representations
       NACHMAN Signs Producers Agreements**

33.    On or about February 2, 2019, in reasonable reliance upon Defendants' false misrepresentations, NACHMAN signed the first Producer Agreement with Defendants (See Exhibit 1, Copy of February 2, 2019, Producer Agreement). Despite this, Defendants never delivered the aforesaid three (3) master recordings to NACHMAN.

34.    On or about March 21, 2019, NACHMAN signed a second Producer Agreement, which Agreement provided that STONE and RVO were to produce and deliver an additional master recording of ARIEL performing the song entitled *"Let it All Go."* However, STONE and RVO also failed to make delivery of the "master" recording of *"Let it All Go"* for which NACHMAN paid said Defendants a total of **$25,000** as provided in that agreement. (See Exhibit 2, Copy of March 21, 2019, Producer Agreement).

35.    In addition to the fraudulent misrepresentations of material fact made by STONE and RVO to NACHMAN prior to his signing the two Producer Agreements (Exhibits 1 and 2, hereto), STONE and RVO continued making intentional misrepresentations of fact to Plaintiffs to fraudulently induce  NACHMAN to continue paying STONE and RVO unreasonably and inordinately large sums of money to record songs, shoot music videos, and take promotional

photographs of ARIEL. Defendants induced NACHMAN to believe that the expenditures he was paying would result in STONE getting ARIEL signed to a record deal with a major record label, when STONE knew that he did not have the capability to obtain such a major record deal for ARIEL.

36.     Thus, STONE continued to make materially false statements to NACHMAN that: (1) STONE was a working professional in the music business who possessed power and influence in said business; and (2) STONE intended to use NACHMAN's resources to establish ARIEL as a successful recording artist, and that he was actually talking to Taylor Swift's people about having ARIEL open for Swift on tour.

**I.     STONE Continues His Fraudulent Scheme to Induce ARIEL To Sign an Exclusive Artist Agreement with Him and RVO**

37.     STONE also continued falsely representing to NACHMAN and ARIEL that highly successful recording artists such as Cardy B and Lil Nas X had heard ARIEL's recordings and loved them.  STONE also falsely represented that audio mastering engineer Bernie Grundman wrote to STONE that: ***"You are truly one of the best song writers/producers I've ever had the pleasure to work with***."  By engaging in the aforesaid conduct with Plaintiffs, Defendants STONE and RVO continued their fraudulent misrepresentations to Plaintiffs in order to fraudulently induce ARIEL to sign an Exclusive Artist Agreement ("EAA") with STONE and RVO after she reached her eighteenth birthday, in the summer of 2020.

38.     STONE also pressured NACHMAN and ARIEL by vehemently ordering both of them to disregard the advice of the attorney they had retained to advise them with respect to all the contracts STONE and RVO had presented to them for their signatures, beginning in January 2019. Specifically, STONE repeatedly contacted NACHMAN by e-mail, and contacted ARIEL by direct

-11-

messaging and by voicemail, falsely representing that: i) their attorney was asking for "ridiculous" changes to the contract his attorneys had drafted; and ii) that their attorney was just trying to "run the clock" so he could bill NACHMAN as much as possible.  STONE further urged ARIEL to disregard what her attorney was telling her and just sign the EAA as drafted by his attorneys.

39.     In reasonable reliance upon all of Defendants' aforesaid false representations, on or about November 6, 2020, ARIEL signed the EAA presented to her by Defendants, as drafted by Defendants' legal counsel. See Exhibit 3 (Exclusive Artist Agreement).

40.     The EAA included a delivery requirement that ARIEL deliver 12 master recordings. As of February 2022, ARIEL had delivered the 12 required masters and then went on to record and deliver another 9 master recordings prior to December 2023.

**J.    STONE's Control of ARIEL's Social Media Accounts**

41.     Defendants JOSH STONE and RVO convinced ARIEL to provide them with the passwords for her social media accounts, including her Instagram Account entitled: @ArielPearlOfficial.  Once Defendants gained control over ARIEL's social media accounts, they changed ARIEL's passwords and thereafter refused ARIEL's requests to access her own social media accounts, while Defendants asserted absolute dominion and control over said social media accounts and the contents thereof.

42.     Defendants asserted total dominion and control over the contents of ARIEL's social media accounts and fraudulently misrepresented the source of such photographs and information so as to appear as if ARIEL had personally posted such content, when she did not.

43.     ARIEL repeatedly asked STONE to return to her control and access over her social media accounts so she could access the content. STONE has continuously refused to provide ARIEL with such access.

-12-

44.     In fact, in response to the instant dispute, STONE has turned ARIEL's social media accounts into a vehicle to sexually harass, abuse and defame her, intentionally causing severe emotional distress to the Plaintiffs.

**K.     STONE's Behavior Towards ARIEL After Execution of the EAA**

45.     After ARIEL's eighteenth (18th) birthday and her execution of the EAA, STONE's attitude and demeanor towards ARIEL changed dramatically.  STONE became more demanding, more erratic in his conduct towards ARIEL and more aggressive in his efforts to separate her from her watchful parents.  STONE would constantly call ARIEL over a period of months and ask her: "Are you working out?  Are you an eleven (11) yet?  Everyone's boyfriend gotta 'want' you!" He would also ask her: "Are you practicing your songs?  I want to put you on tour to open for Taylor Swift/Madison Beer/Olivia Rodrigo/Alicia Keys – but your parents can't always go with you. Joanna and I are always going to be there, but you don't always want to have your parents around, it's not a good look."

46.     Then, after months of weekly phone calls repeating the same demands over and over again, STONE would suddenly disappear.  Six (6) months would go by without a phone call, email or text message from STONE to either Plaintiff, nor would STONE respond to any phone calls, emails or texts sent to him by the Plaintiffs.

47.     When STONE reappeared, instead of explaining his disappearance, STONE would instead issue a whole new set of orders and demands for ARIEL, resulting in STONE's total dominion and control over every part of ARIEL's personal life.

48.     In or about May 2021, STONE instructed ARIEL to travel to Los Angeles, California, in order to record two (2) songs entitled *Roll the Dice"* and *"Never Knew Me,"* with a Grammy award winning producer and songwriter by the name of Tearce Kizzo (professionally

-13-

known as "Kizzo"). NACHMAN accompanied his daughter ARIEL on the trip to California, to ensure her safety, as she was still only eighteen (18) years old at the time.

49. While purportedly shooting a music video for *"Roll the Dice,"* in a remote location (a copy of which purported video was never provided to Plaintiffs in spite of their repeated requests for same), STONE ordered ARIEL to change into skimpy outfits for the video but did not provide her with a dressing room, so ARIEL was forced to change in the back seat of a small car. This happened despite STONE's promise to Plaintiffs that ARIEL would be provided a dressing room for wardrobe changes at all shoots. One of STONE's hangers-on, a man Plaintiffs knew only as "Byron," was peering into the car windows to watch ARIEL change into the aforesaid skimpy outfits.

50. When ARIEL and NACHMAN complained to STONE about "Byron" and informed STONE that his presence made ARIEL feel uncomfortable, STONE refused to address their complaints. Instead, STONE ordered both Plaintiffs to attend a "business" meeting on the rooftop of their hotel, to which STONE also invited Joanna Stone and Byron. During the rooftop meeting STONE complained to both Plaintiffs that he did not want NACHMAN to be present while his daughter was shooting a music video in skimpy outfits. STONE falsely characterized NACHMAN's presence as "disruptive," and both STONE and Byron urged ARIEL to travel alone, without her father, to all future recording sessions and music video shoots. STONE invited Byron to make comments, at which time Byron joined STONE in complaining about NACHMAN and agreed with STONE that NACHMAN's presence was "disruptive." Byron further lectured ARIEL that she would have to travel without her father in the future.

51. ARIEL objected to STONE's demand that she travel alone, without her parents, to all future location shoots and recording sessions, and was very angry when she returned home.

-14-

ARIEL considered sending a written list of her complaints to STONE in an email, but Plaintiffs both decided that an email would result in STONE yelling and screaming at her, and would not result in any changes to the situation.  Thus, ARIEL wrote down a list of her complaints about STONE and RVO, and then scheduled a conference call with STONE, in which NACHMAN, Lori Nachman, STONE and his wife all participated.  However, STONE was impatient and dismissive of ARIEL's complaints during the conference call.  STONE limited his comments to brief, non-responsive remarks, but finally expressed anger and rage over Plaintiffs' complaints, yelling at Plaintiffs that their complaints showed a "lack of respect" for him by Plaintiffs, and a disregard for "all that I've been doing for you, as members of my family."

52.     At his wedding, STONE arranged for ARIEL to sing a song called *"Moonlight"*. After she performed the song STONE called ARIEL over to a group of men he was talking to, and introduced her to everyone.  One of the men in that group was Kizzo, the producer with whom ARIEL had recorded two (2) songs when ARIEL traveled to Los Angeles with MICHAEL NACHMAN, in May 2021.

53.     Kizzo approached ARIEL later on, and asked if he could talk to her.  Kizzo said, "It's been a while since we worked together in California.  I see your Dad is still watching you like a hawk."  ARIEL said, "Yes, he's protective of me," to which Kizzo replied, "Well, that's not a good thing."

54.     Kizzo then said to ARIEL: "So, tell me how you've grown in the past 2 years." ARIEL explained that she is completing her college education on-line, and is learning about different types of music. At that point Kizzo put one arm around ARIEL and put his other hand on her stomach.  She was horrified, and pulled away from him, saying: "Well, it's been really nice to see you."

-15-

55.     Defendant STONE called ARIEL a few days later to inform her that Kizzo had called him to complain about her.  Kizzo reportedly said to STONE: "Wow, Ariel is so grown up.  But I can tell she's still so young. She's not mature enough for the industry."  STONE chastised ARIEL for spurning Kizzo's advances, and advised her: "You gotta play the game.  You shouldn't have put him down. Sometimes you gotta give them what they want."

56.     ARIEL replied, in anger: "Josh, what do you mean??  He put his arm around me and put his hand on my stomach.  Isn't he in his 40's??"  STONE replied: "Yeah, but you're in your 20's, now..."  (ARIEL had just celebrated her 20th birthday three (3) weeks earlier).

57.     In January and February of 2023, Defendant STONE demanded that ARIEL travel to Florida, to pose for photographs and shoot a music video for *"Moonlight,"* a song she recorded for STONE and RVO eighteen (18) months earlier.  NACHMAN traveled to Florida with his daughter to protect her from any further episodes of sexual harassment by STONE or any of his associates.

58.     While in Florida, STONE constantly complained to ARIEL about NACHMAN's presence on the set and falsely accused NACHMAN of interfering with the shooting of video and photographs – the same false complaints STONE made when Plaintiffs were in Los Angeles in 2021.  STONE *specifically* complained to ARIEL that she was "not acting as provocative, and free, and willing" as "they" wanted her to be – and as "they" apparently believed she would be if NACHMAN was not there.

59.     STONE's behavior was more irrational and inconsistent than usual during the trip to Florida.  When Plaintiffs first arrived, STONE told them there was a strict schedule for the shoot.  However, they soon realized there was no schedule.  STONE ordered ARIEL to get her hair straightened at her own expense for a video shoot of ARIEL playing *"Let it All Go"* on piano.  After

ARIEL had her hair straightened STONE canceled the piano shoot, and instructed her to appear for a video shoot on the beach, instead.  ARIEL's warning that a day on the beach would cause her hair to curl up again, fell on deaf ears.  The video shoot on the beach went forward, causing ARIEL's hair to curl up again, so STONE ordered her to get her hair straightened for the second time in two (2) days – *again* at her own expense – which repeated chemical treatment was damaging to her hair.

60.   After ARIEL got her hair straightened for the *second* time on Plaintiffs' last day in Florida, STONE disappeared again.  He never called ARIEL to appear for the photo shoot and did not respond to her phone calls, emails or text messages, leaving her to sit around all day with rollers in her hair. STONE knew that Plaintiffs were flying back to New York the next morning at 7:00 AM.  However, at around 10:00 PM, STONE called and texted ARIEL demanding that she appear for the video shoot at 2:00 AM – five hours before their flight back to New York. ARIEL refused, and complained to STONE about his disappearance that day.  STONE's response was that "I had to focus on the Grammys." STONE in fact had no reason to focus on the Grammys as he had no interests, for himself or any artist, that were a part of the Grammys.

**L.   ARIEL'S Decision to Terminate the Exclusive Artist Agreement**

61.   Finally, after fulfilling the delivery requirement of the EAA, Plaintiffs came to the realization that STONE had lied to them.  On or about February 2024, ARIEL's counsel sought to terminate the EAA pursuant to Paragraph 2, and sub-paragraphs 2(a-c) of the EAA, on grounds that STONE and RVO had failed to sign ARIEL to a qualifying Distribution Deal.

62.   Defendants' attorney responded by email stating, inter alia that:

> Real Vibez Only (hereinafter "RVO") has fulfilled their obligation in accordance with the Exclusive Artist Agreement with the artist "Ariel Ruth Nachman" P/K/A "Ariel Pearl" by entering into a Distribution Agreement with a Distributor as defined in Paragraphs 2(b).  **In**

-17-

**accordance with the contract, the initial term shall automatically
be extended for an additional six (6) months. ...**

(Emphasis supplied.)

63.     Pursuant to DEFENDANTS' attorney's own statement, this six (6) month period

expired on May 6, 2024, and the EAA is now terminated by operation of the terms of the EAA as

interpreted by Defendants' attorney.

64.     In response to ARIEL's termination of the EAA, on March 1, 2024, Defendants

began posting sexually explicit photographs of ARIEL, as part of a harmful alleged "promotional"

campaign called: ***"Daddy's Little Girl."*** The photographs, video clips and messages Defendants

began posting have been designed and intended to harass Plaintiffs ARIEL and NACHMAN, and

cause them to suffer severe emotional distress. As intended, Defendants' campaign has, in fact,

inflicted severe emotional distress upon the Plaintiffs herein.

65.     STONE, individually and on behalf of RVO as its Chief Executive Officer, posted

explicit, revealing and sexually suggestive photographs of ARIEL on STONE's own social media

accounts, and on Plaintiff's @ArielPearlOfficial Instagram Account, with captions and messages

strongly suggestive of an incestuous relationship between ARIEL and NACHMAN, making

statements such as, but not limited to, the following:

> "Only if Daddy Approves 4/19"
>
> "D-A-D-D-Y 4/19" ... "You should never have to tell a real man how
> to be one. Stay tuned......."
>
> "4/19 So EXCITED to debut daddys little girl."

66.     And, in response to the dirty comments coming from the men to whom STONE sent

his illicit posts, STONE wrote the following, message as if it was coming from ARIEL:

**Thank you for the support!**

**Daddys Little Girl Promo Starts 4/5**

**Until then I'll be with Daddy**



67.     Two of the photographs used by Defendants in their campaign of disparagement are original photographs taken and owned by ARIEL (the "Works") (See Exhibit 4, ARIEL photographs).

68.     ARIEL has copyright registrations for both Works. (See Exhibit 5, Copyright Registrations).

69.     ARIEL did not authorize or permit publication of the Works by Defendants, nor did Defendants request a license to use the Works.

70.     Defendants modified the Works without ARIEL's authorization, to add the captions to the photographs making it appear that ARIEL had recorded a song called "Daddy's Little Girl" and such song was going to be released. No such song was ever recorded. (See Exhibit 6 - Infringements of the Works).

71.     On April 3, 2024, Defendants posted to ARIEL's Instagram account a video of a scene from the television series "South Park" which depicts a character deciding which bathroom to use. Posted above the video was the following statement:

> My Daddy doesn't understand the entertainment business, let alone publishing. (I didn't write any of my songs) contracts, endorsements, production, product placement, and what a team is. He wants to mix the songs, be my stylist, manage me, be my road manager, my camera man, producer, executive producer and wants to be me. He even requests his travel and expenses to be paid for as if he is the "artist" or is needed around. Now my daddy is in a lot of trouble & got me in trouble. He doesn't want what's best for me. But I will obey daddy even when he goes behind my back to tarnish all the hard

work I put in to get these opportunities. DADDY'S LITTLE GIRL 4/26. SHOULD I STAND UP FOR MYSELF OR LISTEN TO DADDY?

72.     On April 3, 2024, a second post was made showing a photograph of ARIEL from when she momentarily met artist, Madison Beer. The posted photograph of ARIEL included the completely false comment "Now my 12 city promo tour is officially CANCELLED."  This is another false representation to the public. There never was a "12 city promo tour".

73.     The third post is a video of ARIEL lying in a bikini next to a pool over which music can be heard and overlaid text states: "My daddy won't let me tour and be independent. All this work my team did for me, But He controls my life & gets in the way. #daddysgirl 4/26"

74.     The fourth post was a photograph of NACHMAN in black shorts and a t-shirt. Music plays over the post, and alongside the photograph is a drawing of a male character from the South Park series who is dressed in black and as a woman. Over the photograph the words: "Daddy's Little Girl 4/26" appear. The *South Park* character depicted is the father of one of the protagonists in the *South Park* television series. In Season 18 Episode 9 of *South Park*, this father, dressed as a woman, simulates masturbation before a large audience comprised of women, including his own young daughter.  This posting was obviously made in an effort to draw a comparison between the masturbating father in *South Park* and NACHMAN.

## COUNT ONE
### (Copyright Infringement)

75.     Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 74, as if fully stated herein.

76.     Defendants have clearly breached the requirements of the Copyright Statutes, and more particularly 17 U.S.C. §501 et seq. Section 501 provides that "Anyone who violates any of the

exclusive rights of the copyright owner as provided by §§106 through 118 . . . is an infringer of the copyright."

77.     Section 106 provides that the exclusive rights include the right "to reproduce the copyrighted work" and "to distribute copies . . . of the copyrighted work."  Thus, Defendants are infringers.

78.     Defendants' copying of Plaintiff's Works is a direct admission of willful infringement by Defendants.

79.     Defendants continued use of the Infringing Works will irreparably harm Plaintiff's reputation, business, and goodwill based on the highly offensive and illegal impressions created by the unauthorized derivative works. The aforesaid acts of constitute copyright infringement under 15 U.S.C. §1114(1).

80.     Plaintiff has been harmed by Defendants' infringement in an amount to be determined at trial but not less than $1,0000,000.

### COUNT TWO
### (Fraudulent Inducement)

81.     Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 80 as if fully stated herein.

82.     Defendants made material false representations to Plaintiffs in order to induce them to execute certain agreement – namely 2 Producer Agreements and the Exclusive Artist Agreement.

83.     As a result of Defendants' fraudulent inducement of Plaintiffs executed the agreements and complied with the obligations thereunder.

84.     As a result, Plaintiffs have been damaged in an amount to be determined at trial but no less than $500,000.00.

## COUNT THREE
### (Fraud)

85.     Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 84 as if fully stated herein.

86.     Defendants made material false representations to Plaintiffs in order to defraud them.

87.     Acting in reasonable reliance on Defendants' material false statements, Plaintiffs made expenditures, paid monies and engaged in certain efforts.

88.     As a result, Plaintiffs have been damaged in an amount to be determined at trial but no less than $500,000.00.

## COUNT FOUR
### (Deceptive Acts and Practices (N.Y. G.B.L. §§ 349 AND 350))

89.     Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 88, as if fully stated herein.

90.     Plaintiffs bring this claim for violation of New York General Business Law section 349.

91.     Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y. Gen. Bus. Law § 349(a).

92.     Defendants' conduct constitutes "deceptive" acts and practices."

93.     In accordance with subsection (h) of section 349, Plaintiffs seek an order enjoining Defendants from continuing the unlawful deceptive acts and practices discussed in this complaint. Absent enjoining the unlawful deceptive acts and practices, Defendants will continue their false and misleading practices, causing irreparable harm to Plaintiffs.

94.     As a consequence of Defendants'' deceptive acts and practices, Plaintiffs suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiffs seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages and attorneys' fees. N.Y. Gen. Bus. Law § 349(h).

## COUNT FIVE
## (Section 43(a) of the Lanham Act)

95.     Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 94, as if fully stated herein.

96.     § 43(a) provides for a civil cause of action against:

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.] 15 U.S.C. § 1125(a)(1).

97.     Defendants have used ARIEL's name, image and likeness in commerce, namely on Instagram via what is purported to be her "official" account.

98.     Defendants falsely represent myriad facts about ARIEL, including that she is engaged in an incestuous relationship with her father, that she was to go on tour with Madison Beer but her father would not allow it; that songs that did not exist were going to be released on specific dates and more.

99.     Defendants' posts were all made in connection with the relevant goods and services, namely under the guise of promoting ARIEL's musical career, while truly promoting their own. Consumer confusion as to the origin, sponsorship, or approval of the goods or services is implicit to Defendants' campaign, as @ArielPearlOfficial's followers and Instagram's userbase at large would necessarily perceive that ARIEL herself published and ran the account, particularly because the posts were posted to her "official" account and riddled with missives about her "daddy."

100.     Plaintiff ARIEL has been harmed by Defendants' violative acts in an amount not less than $1,000,000.00.

## COUNT SIX
### (Defamation)

101.     Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 100, as if fully stated herein.

102.     Defendants published false and defamatory statements about Plaintiffs as described herein

103.     The statements were false at the time of publication.

104.     Third parties could reasonably determine that the statements were clearly about Plaintiffs.

105.    Defendants knew that the statements were false when publishing the statements.

106.    The false statements are defamatory because they tend to subject Plaintiffs to hatred, distrust, ridicule, contempt, and disgrace.

107.    Defendants acted with malice in publishing the statements because Defendants' sole motive in publishing the statements was to injure Plaintiffs.

108.    As a direct result of the damage to Plaintiffs' reputation caused by Defendants' publication of the statements, Plaintiffs suffered special damages.

109.    As a direct result of Defendants' publication of the statements, Plaintiffs have also suffered non-economic damages, including but not limited to severe emotional distress.

**COUNT SEVEN**
**(Unfair Competition)**

110.    Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 109, as if fully stated herein.

111.    The aforesaid acts of Defendants constitute unfair competition in violation of the common law of the State of New York.

112.    Plaintiffs have been damaged by Defendants' violative acts in an amount not less than $1,000,000.00.

**COUNT EIGHT**
**(Declaration That Contract Is Extinguished)**

113.    Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 112, as if fully stated herein.

-25-

114.    Pursuant to 28 U.S.C. § 2201, a party may seek a declaration of rights and other legal relations of any interested party seeking such declaration.

115.    By Defendants' attorney's own statements, the term of the Exclusive Artist Agreement expired as of May 6, 2024.

116.    Accordingly, Plaintiffs seek a declaration from this Court declaring the Exclusive Artist Agreement to have expired and freeing the parties from any and all further obligations thereunder and extinguishing any and all future rights granted therein.

**COUNT NINE**
**(Breach of Contract)**

117.    Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 116, as if fully stated herein.

118.    The parties herein entered into three (3) agreements: two Producer Agreements entered by Plaintiff NACHMAN (Exhibits 1 and 2) with Defendant RVO, and the Exclusive Artist Agreement entered by Plaintiff ARIEL with Defendant RVO (Exhibit 3).

119.    As alleged herein, Defendant RVO breached its duties under the Exclusive Artist Agreement by failing to fulfill its obligations thereunder. Defendant RVO also violated its duty of good faith and fair dealing.

120.    Similarly, Defendant RVO violated its duties under the two (2) producer agreements. RVO also violated its duties of good faith and fair dealing under the producer agreements.

121.    As a result of Defendant RVO's breaches of its duties under the agreements, Plaintiffs have been damages in an amount not less than $500,000.00.

**COUNT TEN**
**(Unjust Enrichment)**

122.     Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 121, as if fully stated herein.

123.     Pursuant to the agreements described herein, Plaintiffs delivered to Defendants certain monies and services that enriched  Defendants.

124.     Such enrichments were unjust as Defendants procured these benefits through fraud.

125.     As a result of Defendant RVO's breaches of its duties under the agreements, Plaintiffs have been damages in an amount not less than $500,000.00.

**COUNT ELEVEN**
**(Intentional Infliction of Emotional Distress)**

126.     Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 125, as if fully stated herein.

127.     As alleged herein, Defendants willfully made defamatory and harmful statements about Plaintiffs intending to cause severe emotional distress. In addition, Defendants have acted in a manner to cause severe emotional distress.

128.     Defendants have caused Plaintiffs severe emotional distress.

129.     As a result, Plaintiffs have been damaged in an amount not less than $10,000,000.00.

**COUNT TWELVE**
**(Negligent Infliction of Emotional Distress)**

130.     Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 130 as if fully stated herein.

131.    As alleged herein, Defendants made defamatory and harmful statements about Plaintiffs causing severe emotional distress. In addition, Defendants have acted in a manner to cause severe emotional distress.

132.    Defendants have negligently caused Plaintiffs severe emotional distress.

133.    As a result, Plaintiffs have been damaged in an amount not less than $10,000,000.00.

**COUNT THIRTEEN**
**(New York Right To Privacy)**

134.    Plaintiffs re-allege and incorporate by reference the allegations of paragraphs 1 through 133, as if fully stated herein.

135.    Defendants have violated Plaintiff ARIEL's and Plaintiff NACHMAN's rights to privacy and publicity as embodied in NY. Civ. §§ 49-50.

136.    As a result, Plaintiffs have been damaged in an amount not less than $1,000,000.00.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants that:

a.    Defendants have infringed Plaintiffs' Works;

b.    Defendants have engaged in unfair competition in violation of the New York State common law and 15 U.S.C. §1125(a);

c.    Defendants' infringement of Plaintiff's copyrights, and its unfair competition, were willful;

d.    Permanently enjoining Defendants and their officers, directors, agents, servants, employees, representatives, attorneys, related companies, successors, assigns, and all others in active concert or participation with them from further infringement or use of the Works or the name, image and likeness of Plaintiffs, or otherwise, to market, advertise, distribute, or identify Defendants' products or services where that designation would create a likelihood of confusion, mistake, or deception with the Plaintiffs;

-28-

e. Ordering Defendants to account to Plaintiffs for all gains, profits, and advantages derived by Defendants by their infringement of Plaintiffs' copyrights, name, image and likeness, and any other damages to which Plaintiffs are entitled under law;

f. Awarding Plaintiffs all damages they sustained as the result of Defendants' acts of infringement and unfair competition, said amount to be trebled, together with prejudgment interest, pursuant to 15 U.S.C. § 1117;

g. Awarding to Plaintiffs all profits received by Defendants from sales and revenues of any kind made as a result of its willful and intentional infringing actions, said amount to be trebled, after an accounting pursuant to 15 U.S.C. § 1117;

h. Awarding Plaintiffs their reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117, because of the exceptional nature of this case;

i. Awarding Plaintiffs judgment against Defendants for defamation and an award of damages, including special damages, non-economic damages, and exemplary damages in an amount to be determined at trial;

j. Awarding Plaintiffs judgment against Defendants for violation of their right to privacy and publicity and an award of damages in an amount to be determined at trial;

k. Awarding Plaintiffs judgment against Defendants for breach of contract and/or unjust enrichment and an award of damages, in an amount not less than $500,000.00, in an amount to be determined at trial;

l. Awarding Plaintiffs judgment against Defendants for intentional and negligent infliction of emotional distress, and an award of damages, including special damages, non-economic damages, and exemplary/punitive damages in an amount not less than $10,000,000.00, such amount to be determined at trial;

m. Awarding Plaintiffs judgment against Defendants for fraud and fraudulent inducement and an award of damages, including exemplary damages in an amount not less than $1,000,000.00, to be determined at trial;

n. Awarding Plaintiffs judgment declaring that the Exclusive Artist Agreement between Plaintiff ARIEL and Defendant RVO is expired and no longer in force and effect;

o. Awarding Plaintiffs judgment against Defendants for violation of the Deceptive Acts and Practices (N.Y. G.B.L. §§ 349 AND 350)) and an order enjoining Defendants from continuing the unlawful deceptive acts and practices, and an award of damages for actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages and attorneys' fees. N.Y. Gen. Bus. Law § 349(h);

p.      Awarding statutory damages for Defendants' copyright infringing conduct in an amount to be determined at trial;

q.      Pursuant to 15 U.S.C. §1116(a), directing Defendants to file with the Court and serve on Plaintiffs within thirty (30) days after issuance of an injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

r.      Pursuant to 15 U.S.C. § 1118, requiring that Defendants and all others acting under Defendants' authority, at their cost, be required to deliver up and destroy all devices, literature, advertising, labels and other material in their possession that infringe on Plaintiffs' rights;

s.      Awarding Plaintiffs punitive damages against Defendants; and

t.      Awarding such other and further relief as is just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: New York, New York
       May 7, 2024

                        ADWAR IVKO LLC
                        For Plaintiffs Ariel Nachman and
                           Michael Nachman
                        By:  /Stephanie Furgang Adwar
                        Stephanie Furgang Adwar (SA1711)
                        Armando Llorens (AL1757)
                        Megan Abner (MA7777)
                        225 West 34th Street, Fl 9
                         New York NY 10122
                         Tel: 212-725-1818
                         stephanie@adwarivko.com
                         armando@adwarivko.com
                         megan@adwarivko.com

-30-